**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| DONGHYUK KIM | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  19-2037 |
| | ) | |
| vs. | ) | **COMPLAINT AND JURY DEMAND** |
| | ) | |
| THE UNIVERSITY OF NORTHERN | ) | |
| IOWA, MARK A. NOOK, President of the | ) | |
| University of Northern Iowa in his | ) | |
| official capacity, LEAH GUTKNECHT, | ) | |
| in her individual and official capacities, | ) | |
| CHRISTINA ROYBAL, in her individual | ) | |
| and official capacities, LESLIE K. | ) | |
| WILLIAMS, in her individual and | ) | |
| official capacities, PAULA KNUDSEN, | ) | |
| in her official capacity, NICHOLAS | ) | |
| RAFANELLO, in his individual and | ) | |
| official capacities, ALLYSON | ) | |
| RAFANELLO, in her individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT AND JURY DEMAND**

For causes of action against Defendants the University of Northern Iowa, (herein "Northern Iowa" or the "University"), Mark A. Nook, (herein "Nook") Leah Gutkenecht (herein "Gutknecht"), Christina Roybal (herein "Roybal"), Leslie K. Williams (herein "Williams"), Paula Knudsen (herein "Knudsen"), Nicholas Rafanello (herein "N. Rafanello"), Allyson Rafanello (herein "A. Rafanello"), Plaintiff Donghyuk Kim (herein "Kim") states:

1

## INTRODUCTION

1. This is a civil action seeking money damages against all Defendants for violation of Kim's constitutional rights. It asserts a 42 U.S.C. § 1983 claim against all Defendants for violations of Kim's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a claim for violations of Title IX of the Education Amendments of 1972, and breach of contract. The claims arise from the violation of Kim's right to a procedurally fair and unbiased investigation and eventual expulsion after his alleged violation of Northern Iowa's "Student Conduct Code" (herein "the Conduct Code") with regard to a complaint made by "Jane Roe" of nonconsensual sexual contact.

2. The Defendants conducted an unreasonable, inadequate, and biased investigation into Jane Roe's complaint of nonconsensual sex. Defendants never challenged Jane Roe's version of events and presented only biased and unsupported allegations as "Findings of Fact" to the ultimate fact finders which were designed to prejudice Kim and force him out of school. When Kim appealed the ruling, Defendants denied him access to the evidence and information used by investigators in compiling their Investigative Report (herein "the Report"). The Report was used to expel Kim even though he didn't get to meaningfully challenge the Report or the alleged evidence supporting it.

3. Defendants intentionally and/or recklessly allowed, recruited, and used individuals with pervasive undisclosed conflicts of interest to investigate the complaint, draft the Report, conduct a Conduct Review Hearing (herein "Hearing."), and expel Kim from school. One of the two individuals assigned to investigate the complaint, gather facts, and make recommendations regarding expulsion was married to the individual who chaired the Hearing Board and acted as the "Fact Finder" for the University. Other individuals held

conflicting dual roles as Title IX coordinator, Dean of Students, and, on appeal, the final reviewer of the Hearing Board decision to expel Kim. Yet another individual held the dual role of investigator and Assistant to the Dean of Students. The Chair of the Hearing Board was also Director of Residence Life, a position that involved work supervision of Jane Roe. These glaring conflicts are set forth in more detail below.

4. During the Hearing, neither Kim nor the Hearing Board were allowed to see Jane Roe in order to assess her credibility. The Hearing Board was not provided any access to any of the "evidence" examined by investigators in compiling the Report used in the expulsion process. During the hearing, Kim was not allowed the right to cross-examine Jane Roe or meaningfully challenge her version of events in any way. The Hearing Board was not provided any information or evidence contained in the Report so as to allow them to discharge the duty of fairly determining the facts surrounding Jane Roe's allegations. The Hearing Board was not able properly formulate questions of Jane Roe in order to assess her credibility or substantiate any of the surrounding facts and circumstances of her complaint. Important exculpatory information was withheld from the Hearing Board or presented as non-factual allegations.

5. The decision of the Hearing Board, relied solely on the biased and unfair Report from conflicted investigators, and was not supported by substantial evidence. The resulting decision of the hearing board to expel Kim from the University was essentially a sham and a rubber stamp of the Report and without consultation of Defendant Gutknecht, the Title IX Officer, contrary to the Conduct Code.

6. After retaining an attorney for an appeal (herein the "Appeal") of the Hearing Board decision, Kim was denied the right to a one-week extension for his attorney to prepare for

3

an Appeal. The failure to allow a seven-day extension to prepare an Appeal was unreasonable and not supported by the reasons stated, which the University said was "to stay within the Policy guidelines for processing the case." Prior to Kim's request for an extension, the University had already failed to process the case according to their Conduct Code guidelines, it only enforced time guidelines against Kim, as a male, while extending deadlines for the female accuser. On appeal, Kim's attorney was again denied access to the evidence used in compiling the Report. Kim's attorney was simply provided with the Report (containing unsupported conclusions) and allowed to listen to the audio recording of the Hearing in preparing for the Appeal.

7. The Appeal decision upholding the Hearing Board's decision was a sham and a rubber stamp of the flawed and biased decision of the Hearing Board.

8. On August 8, 2017, after exhausting his right to appeal to the University, Kim was expelled. The expulsion was a sanction against Kim that was contrary to established policy and procedure and violated his rights[1].

9. On August 13, 2017, Kim was charged with Sexual Abuse in the 3rd in violation of Iowa Code § 709.4(1)(D) based on Jane Roe's allegation of nonconsensual sex, in Black Hawk County District Court.

---

[1] In April 2011, the Department of Education's (DOE) Office for Civil Rights (OCR) released a Dear Colleague Letter to all Title IX institutions. Office of Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter (2011) (herein Dear Colleague Letter, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. "The OCR is authorized by Congress to enforce Title IX's prohibition on sex discrimination by issuing rules, regulations, or orders of general applicability and has issued significant guidance over time about how OCR interprets Title IX. Guidance is not formally, legally binding, but if schools do not comply with the Department of Education's guidance, they risk losing federal funding. In the wake of this threat, colleges overcorrected their sexual assault policies by adopting polices that shirk the legally mandated due process rights of students accused of misconduct and effectively presume their guilt." **See** *When Campus Sexual Misconduct Policies Violate Due Process Rights*, Journal of Law and Public Policy: Vol. 26: Iss. 3, Article 8. https://scholarship.law.cornell.edu/cjlpp/vol26/iss3/8

4

10. Recognizing the lack of credible evidence against Kim, on November 21, 2017, a jury acquitted Kim of all charges.

11. Kim's case is a prime example of the injustice that occurs when colleges and universities provide an incomplete and biased process, which consistently fails to provide an accused student due process, in sexual misconduct cases.[2]  Under this scenario, an individual may be found not guilty and acquitted of all charges in a criminal case but may still have his academic and career goals sidetracked or even destroyed.[3]

12. Kim's case further highlights the problem of colleges and universities, including Northern Iowa, in investigating and adjudicating allegations against students *prior* to the conclusion of any parallel criminal case.

13. As a result of Defendants' imposition of the unconstitutional and erroneous sanction against Kim, he has sustained economic injuries, the loss of educational and career opportunities, and emotional distress.

---

[2] *See Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (find that plaintiff's alleged flaws in the school's proceedings, including omitting and failing to consider particular evidence "amount[ed] to 'a practice of railroading accused students'); *see also Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 732 (E.D. Va. 2015) (finding that the school's procedure was flawed based on its "failure to provide a neutral arbiter without prior involvement in the case") ; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778-79 (S.D. Ohio 2015) (finding the Title IX investigator's "discourag[ing] a witness from testifying at the disciplinary hearing. . . troubling") *See Generally Doe v. Salisbury Univ.*, No. JKB-15-517, 2015 WL 5005811, at (D. Md. Aug. 21, 2015) (SU barred plaintiffs from reviewing witness statements and the list of witnesses prior to the board hearing, and failed to provide plaintiffs with all evidence that was to be presented to the Board."; *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 750 (S.D. Ohio 2014) (finding that the complaint survived a motion to dismiss because it ' recounts Defendants having rushed to judgment, having filed to train UCB members, having ignored the Prosecutor, having denied Plaintiff counsel, and having denied Plaintiff witnesses. . . because he was a male accused of sexual assault").

[3] In September 2017 the United States Department of Education repealed the April 2011 Dear Colleague Letter and issued new guidance permitting colleges and universities to apply the "clear and convincing evidence standard."

## THE PARTIES

14. Kim is a natural person, a foreign exchange student from South Korea, and was a resident of the State of Iowa during the pendency of the University's investigation and sanction of expulsion. Kim is now a resident of the State of Utah and re-enrolled in school a thousand miles away from his school of choice.

15. Defendant Northern Iowa is a state-funded university in the State of Iowa, with its principal administrative offices in Cedar Falls, Iowa. Northern Iowa is authorized, supervised and funded by the State of Iowa pursuant to Iowa Code § 262.7 through the Board of Regents. As a part of a subdivision of the State of Iowa, it is liable pursuant to both Iowa Code Chapter 669 and 42 U.S.C. § 1983.

16. At all relevant times, Defendant Mark A. Nook (herein "Nook") was a natural person and a resident of the State of Iowa. Nook is the President of Northern Iowa. At all relevant times, Nook is alleged to have acted in his official capacity and under color of state law. At all relevant times, Nook was an agent, servant, and employee of Northern Iowa acting within the scope of his employment. Nook is sued in his official capacity. He was responsible for implementing the policies and procedures pursuant to which the investigation against Kim was to be carried out overseen by Northern Iowa's supervising Title IX Officer, Leah Gutkenecht.

17. At all relevant times, Defendant Leah Gutkenecht (herein "Gutkenecht") was a natural person and resident of the State of Iowa. Gutkenecht was the University's Title IX Officer as well as Assistant to the President for Compliance and Equity Management (herein "OCEM"). OCEM oversees specific polices, including the polices and Conduct Code at issue in this case, which purport to protect students and faculty against

discrimination, harassment, and sexual misconduct. Gutkenecht is alleged at all times to have acted in her individual and official capacities under color of state law. At all relevant times, Gutkenecht was an agent, servant, and employee of Northern Iowa acting within the scope of her employment. Gutkenecht was responsible for coordinating the University's response to reports of sexual misconduct under the Policy. Gutkenecht was also responsible for selecting the two individuals, one of whom had a clear conflict of interest, charged with investigating the complaint made by Jane Roe. Defendant Gutkenecht is sued in her individual and official capacities.

18. At all relevant times, Defendant Christina Roybal (herein "Roybal") was a natural person and resident of the State of Iowa. Roybal was the Senior Associate Athletic Director and Title IX Deputy Coordinator within the OCEM. Roybal is alleged at all times to have acted in her individual and official capacities and under color of state law. At all relevant times, Roybal was an agent, servant, and employee of Northern Iowa acting within the scope of her employment. Royal was responsible for coordinating the University's response to reports of sexual misconduct under the Policy. Royal was also selected to review Kim's Appeal regarding the Hearing Board's decision. In a letter dated August 8, 2017, she upheld the sanction of expulsion against Kim. Defendant Roybal is sued in her individual and official capacities.

19. At all relevant times, Defendant Leslie K. Williams (herein "Williams") was a natural person and resident of the State of Iowa. Williams was the Dean of Students and Title IX Deputy coordinator within the OCEM. Williams is alleged at all times to have acted in her individual and official capacities and under color of state law. At all relevant times, Williams was an agent, servant, and employee of Northern Iowa acting within the scope

7

of her employment. Williams was responsible for selecting the three-member Hearing Board which heard Jane Roe's complaint and which recommended the sanction of expulsion and included appointment of a Hearing Officer with a clear conflict of interest. Defendant Williams is sued in her individual and official capacities.

20. At all relevant times, Defendant Paula Knudson ("Knudson") was a natural person and resident of the State of Iowa. Knudsen was the Vice President for Student Affairs at Northern Iowa. Knudsen is alleged at all times to have acted in her official capacity and under color of state law. At all relevant times, Knudsen was an agent, servant, and employee of Northern Iowa acting within the scope of her employment. Knudsen was responsible for selecting Defendant Roybal as the person who reviewed Kim's Appeal, pursuant to the Policy. Defendant Knudsen is sued in her official capacity.

21. At all relevant times, Defendant Nicholas Rafanello (N. Rafanello) was a natural person and resident of the State of Iowa. N. Rafanello was the Director of Residence Life at Northern Iowa. N. Rafanello is alleged at all times to have acted in his individual and official capacity and under color of state law. At all relevant times, N. Rafanello was an agent, servant, and employee of Northern Iowa acting within the scope of his employment. N. Rafanello had a clear conflict of interest which prevented him from being fair and impartial because he was married to A. Rafanello, who investigated the complaint and made formal recommendations to the Hearing Board. N. Rafanello was also conflicted because, prior to his appointment as Chair of the Hearing Board, he had been expressly exposed to Jane Roe's biased and incorrect version of the incident as part of the reporting process. Further N. Rafanello was Director of Residence Life and was in direct line of supervision over Jane Roe's employment. Upon information and belief, N.

Rafanello never disclosed his clear conflicts of interest to Kim. Defendant N. Rafaanello is sued in his individual and official capacities.

22. At all relevant times, Allyson Rafanello was Assistant Dean of Students at Northern Iowa. A. Rafanello is alleged to at all times to have acted in his individual and official capacity and under color of state law. At all relevant times, A. Rafanello was an agent, servant, and employee of Northern Iowa acting within the scope of her employment. A. Rafanello had a clear conflict of interest which prevented her from being fair and impartial because she was married to N. Rafanello, who was Chair of the Hearing Board. Further as Assistant Dean of Students she may have been exposed to Jane Roe's biased and incorrect version of the incident in her role as the Assistant to Leslie K. Williams, Dean of Students. Upon information and belief, A. Rafanello never disclosed her clear conflicts of interest to Kim. Defendant A. Rafanello is sued in her individual and official capacities.

## JURISDICTIONAL AND VENUE STATEMENT

23. This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because (i) the federal law claims arise under the constitution and statues of the United States; (ii) Plaintiff and all Defendants are citizens of different states; and (iii) the state law claim is so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

24. The Court has personal jurisdiction over Defendant Northern Iowa on the ground that it is conducting business within the State of Iowa and it is located within the Northern District of Iowa.

25. This Court has personal jurisdiction over the remaining Defendants on the grounds they were employed by Northern Iowa at all times relevant herein and personally acted within the State of Iowa and the Northern District of Iowa.

26. Venue is appropriate pursuant to 28 U.S.C §§ 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

## I. Northern Iowa Faces Federal Pressure to Comply with Title IX

27. On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (herein "DCL"). As detailed *supra*, the DCL advised recipients that sexual violence constituted sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

28. On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled "Questions and Answers to Title IX and Sexual Violence" ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." *See* Q&A at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

10

29. On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them" **Chronicle of Higher Education**, September 1, 2014.  In the same article, the Chronicle reported that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appears to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the women's consent." *Id.*

## II.  Kim's Academic and Disciplinary Record

30. Prior to the Northern Iowa's imposition of the unwarranted sanction of expulsion against Kim, he was a sophomore foreign exchange student from South Korea.  He lived in the Waterloo-Cedar Falls area since 2009 and obtained his high school diploma from Waterloo Christian School with a 3.9 GPA.  Kim then enrolled at Northern Iowa where he completed two years of study and then returned to South Korea to complete his mandatory two years of military service in the South Korean Air Force.  Kim returned to Cedar Falls to resume his studies at Northern Iowa in January, 2017.

31. During his time at Northern Iowa, Kim majored in accounting.  Prior to the University's investigation of Jane Roe's false allegations against him, Kim was in good standing at Northern Iowa, had no prior disciplinary record and was well positioned to graduate.

### III. **Northern Iowa's Policies and Contract with Kim**

32. Upon his acceptance to Northern Iowa, Kim was provided online access and paper copies of the University's Office of Compliance and Equity Management ("OCEM") Policy, among other things, on "Discrimination, Harassment and Sexual Misconduct Policy ("the Conduct Code") which set forth the definitions and procedures pursuant to which allegations of sexual misconduct were investigated and students accused of violating the Conduct Code were, possibly, disciplined. Upon information and belief, this policy was updated following the DCL guidance letter, and was in place during the 2016-2017 academic year[4], the period relevant to Jane Roe's allegations against Kim.

33. The Conduct Code, in relevant part, defined "non-consensual sexual contact" as:

> "Any intentional sexual touching, however slight, with any object, by a person that is without consent and/or by force. Sexual touching includes any bodily contact with the breasts, groin, genitals, mouth or other bodily orifice of another individual or any other bodily contact in a sexual manner."

34. The Conduct Code defined "non-consensual sexual intercourse" as:

> "Any sexual penetration or intercourse (anal, oral, or vaginal), however slight, with any object, by a person upon another person that is without consent and/or by force. Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger or object, or oral copulation by mouth-to-genital contact or genital-to-mouth contact."

35. The Conduct Code defined "consent" as:

> "Consent is knowing, voluntary, and clear permission by word or action to engage in mutually agreed upon sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to make certain that the other has consented before engaging in the activity. For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Consent to a specific sexual contact (such as kissing or fondling) cannot be presumed to be consent for another specific sexual activity (such as intercourse). A current or previous dating relationship is not sufficient to constitute consent. Silence or the absence of resistance alone is not consent. The existence of consent is based on the totality

---

[4] When referring to the Policy, Kim refers to the policy in place during the 2016-2017 academic year.

of the circumstances, including the consent in which the alleged incident occurred. Individuals can withdraw consent at any time during sexual activity by expressing in words or actions that they no longer want the act to continue, and, if that happens, the other person must stop immediately."

36. The Conduct Code defined "incapacitation", *inter alia*, as follows:

"A person cannot consent if they are incapacitated. Under this policy, a person is incapacitated if they are disabled or deprived of ability to act or reason for one's self, unable to understand what is happening, or disoriented, helpless, asleep, or unconscious for any reason, including due to alcohol or other drugs. Incapacitation is defined as a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g. to understand the "who, what, when, where, why or how" of their sexual interaction)."

"An individual who engages in sexual activity when the individual knows, or should know, that the other person is physically or mentally incapacitated has violated this policy. It is not an excuse that the respondent to a claim of sexual misconduct was intoxicated and, therefore, did not realize the other person's incapacity."

37. The Conduct Code implemented a "preponderance of the evidence" standard for evaluating complaints, or that "it is more likely than not that the policy violation occurred."

38. The Conduct Code outlined a list of sanctions which may be imposed after being found responsible for a violation of misconduct. Sanctions determined were to be proportionate to the severity of the violation and the cumulative history of the respondent.

39. Students who were found to be responsible for a violation of misconduct were permitted to appeal in writing to the Title IX Officer within five (5) business days of the date of the final written notice." A person designated by the Vice President for Student Affairs is then assigned to review the appeal. Appeals were limited to allegations of the following: "(1) A procedure error or omission occurred that significantly impacted the outcome; (2) There is new evidence, unknown or unavailable during the investigation, that could

13

substantially impact the finding or sanction. A summary of this new evidence and its

potential impact upon the investigation must be included in the appeal; and/or (3) The

sanction imposed are substantially disproportionate to the severity of the violation."

40. The 2016-2017 OCEM "XII: Student Conduct Procedures", which the OCEM wrongfully

applied in Kim's case provide, in relevant part:

(a) "Allegations of misconduct may be received by the Dean of Students or designee from any source (victim, Resident Assistant, third party, online, police, community member, etc.)".

(b) "Allegations of Sexual Misconduct 13.02, will be referred to the Office of Compliance of Equity Management ("OCEM") for resolution."

(c) "Following receipt of notice or a complaint, Title IX or Deputy Coordinator will normally, within four business days, make an initial determination as to whether the information has merit to reasonably indicate there may have been a violation of University policy. If it appears a violation may have occurred, an investigation will begin. An investigation will be pursued if there is sufficient information to suggest a policy violation may exist, a pattern of misconduct, and/or a perceived threat of further harm to the community, or any of its members."

(d) "Once an investigator has been assigned, written notice of the allegations will be provided to the parties involved."

(e) "If a complainant wishes to pursue a formal complaint or if the University determines an investigation is necessary, the Title IX Officer will assign an investigator, usually within two business days of determining that a complaint should proceed. Investigations will be thorough and impartial and will entail interviews with relevant parties and witnesses, and obtaining available evidence."

(f) "The University aims to complete investigations within sixty days, which can be extended as necessary for appropriate cause by the Title IX Officer with notice to the parties. Investigations may take longer when initial complaints fail to provide direct first-hand information. The University may undertake a short delay (usually 3-10 days, to allow evidence collection) when criminal charges are being investigated. University action will continue regardless of the status of civil or criminal charges involving the same incident."

(g) "Upon receipt of the investigative report, the Title IX Officer will forward it to both parties and the Dean of Students or designee for an appropriate hearing per Student Conduct Code procedures."

14

(h) "For allegations of misconduct when sanctions may include suspension or expulsion from the University, hearings will be conducted in accordance with procedures established by the Dean of Students"

(i) "At the hearing, both the complainant and respondent have the right to one advisor of their own choosing. The role of the advisor is passive, they may not ask questions or make arguments during a hearing. They may confer quietly with their advisee, exchange notes, and suggest questions to their advisee."

(j) If, following a hearing, the student is found to have violated University policy, appropriate disciplinary sanctions will be determined after consultation with the Title IX Officer. The written decision must be issued within fifteen working days of the date of receipt of the investigative report from the Title IX Officer.

(k) Once an appeal is decided, the outcome is final: further appeals are not permitted under this policy."

## IV. The Relationship Between Kim and Jane Roe

41. Kim and Jane Roe became friends during the 2016-17 winter break, when she was introduced to Kim at an event for Korean students. Kim provided her and other Korean students on campus rides to Wal-Mart and they hung out a couple of times together in a group setting.

## V. Jane Roe's University Complaint Against Kim

42. On March 20, 2017, Officer Jeager with the University of Northern Iowa Police Department brought Jane Roe to Dean of Students, Defendant Williams, to discuss the process of filing a complaint and listened to her allege facts against Kim. Williams, *in her role as Dean of Students*, recommended an advocate and stated in an e-mail to Defendant Gutknecht, "I could tell that she wanted and needed to talk more with an advocate, so I told her I would help her get connected with Joan Thompson."

15

43. On March 23, 2017, Jane Roe filed a formal complaint with the OCEM alleging nonconsensual sexual intercourse by Kim.[5]

44. Prior to filing a formal complaint with OCEM, Jane Roe reported the incident to Coree Burton, (herein "Burton") an employee on call at the University. Burton gathered information and explained the investigative process to Jane Roe at the University. Burton contacted Defendant N. Rafanello *in his role as the Director of Residence Life*, to inform him of Jane Roe's allegations against Kim.[6]

45. Upon information and belief, Jane Roe was employed at Rialto[7] while enrolled at Northern Iowa. Upon information and belief, Defendant N. Rafanello, in his role as Director of Residence Life, was in a senior leadership position and in a direct line of work supervision over Jane Roe.

46. On March 24, 2017, Defendant Gutknecht, Assistant to the President for OCEM and Title IX Officer, reportedly reviewed the details of Jane Roe's complaint and assigned two investigators to investigate the allegations: Gary Robinson (herein "Robinson"), an Equal Opportunity Specialist at OCEM and Defendant A. Rafanello[8], Assistant Dean of Students. Both are reportedly "trained civil rights investigators."

47. Robinson and Defendant A. Rafanello, pursuant to the Conduct Code, were supposed to "thoroughly and impartially interview relevant parties and witnesses and obtain available evidence."

---

[5] The Investigation Timeline/Checklist indicated that the University received the complaint on March 16, 2017, via a 'crime alert'. An "intake" by OCEM was reportedly not completed until March 23, 2017.
[6] Despite having formal knowledge of the allegations against Kim without Kim's side of the story, Defendant N. Rafanello was later appointed to chair the formal disciplinary hearing against Kim.
[7] Rialto is a dining hall on the Northern Iowa campus.
[8] At all times relevant to the investigation, Nick and Allyson Rafanello were married to each other.

48. On or about the end of March 2017, Robinson and Defendant A. Rafanello attempted to schedule interviews of the relevant parties. Many of the witnesses contacted for interviews, did not immediately respond to a request for an interview. In response, Defendant Gutknecht wrote letters which warned them that a failure to respond to a request for an interview would result in a referral to the Dean of Students for potential disciplinary procedures.

49. On May 30, 2017, Robinson and Defendant A. Rafanello informed Kim they had interviewed all known witnesses and were in the process of completing their Report (herein the "Report").

50. On or about May 18, 2017, Defendant Gutknecht received the Report from Robinson and Defendant A. Rafanello. Based upon information and belief and contrary to the Conduct Code, Gutknecht instead of rendering a required decision to approve or disapprove the Report, instead requested edits of the report. A series of edits to the Report are alleged to have occurred, including some by legal counsel, and then a Notice of Outcome was completed on June 2, 2017 without the Report ever being formally approved or disapproved. Upon information and belief, edits of the Report were either done or specifically requested by persons who did not prepare or draft the Report and did not have access to any evidence or information contained in the Report. The edits of the Report were unauthorized by the Conduct Code.

51. On June 13, 2017, Defendant Williams informed Kim in writing that he was named in a possible violation of community standards and scheduled a Conduct Review (disciplinary) "Board Hearing" for June 19, 2017. Upon information and belief, Defendant Williams selected Defendant N. Rafanello, Student Conduct Administrator as

17

Chair, Karen Cunningham, faculty member, and Claire Collins, student member as members of the Hearing Board.[9]

52. On June 23, 2017, Defendant Williams informed Kim in writing that he was held "responsible" for violating Section E.1 of the Discrimination, Harassment, and Sexual Misconduct Policy. Specifically, the hearing board found that Kim engaged in non-consensual sexual intercourse and sexual contact with Jane Roe while she was incapacitated by alcohol and unable to give consent. The letter informed Kim the Hearing Board decided the appropriate sanction against him was expulsion.

53. On June 30, 2017, Kim appealed the Hearing Board's decision.

54. On August 8, 2017, Northern Iowa, through Defendant Roybal, wrote Kim a letter which upheld the Hearing Board's decision and denied his appeal.

**VI. The Erroneous Findings**

55. The Report contained Defendant A. Rafanello's and Robinson's "subjective" summary of the evidence they reviewed concerning Jane Roe's complaint and their finding as to whether Plaintiff violated the 2016-2017 Student Conduct Code. Per the Report on page 23:

> "It seems reasonable to assume that when presented with the above information, a reasonable person should have known that another person would not have been able to make a rational, reasonable decisions. It also seems reasonable to assume that when presented with the above information, the complainant would not have been able to appreciate the situation and address it consciously, such that any consent would not have been informed by knowing the "who, what, when, where why and how."

56. The Report stated further on page 25:

> "[C]onsent is based on the totality of the circumstances, including the context in which the alleged incident occurred."

---

[9] N. Rafanello's appointment was made knowing that his wife had conducted the investigation and completed the Report which made specific inculpatory findings against Kim.

57. The Report contained the following 16 bullet point "**Conclusions of Fact**" which were largely inculpatory on page 24-25 and to which the "Investigators" claimed supported their summary of the policy violations included above. Investigators stated the following as **Conclusions of Fact**:

   a. Jane Roe and Witness A went to Social House[10] around 10:00 p.m. and had at least three drinks plus at least four to five shots between approximately 10:00 p.m. and 1:30 a.m.

   b. Witness A texted Kim around 1:30 a.m. to have him pick her and Ashley up at Social House.

   c. Witness E drove Kim and Witness C to Social House and picked up Ashley and Witness A.

   d. Witness E drove Jane Roe, Kim, Witness A and Witness C to Kwik Star.

   e. Witness E drove Jane Roe, Kim, Witness A and Witness C to his apartment at Gold Falls.

   f. After a short time in Witness E's apartment, Witness A got sick.

   g. After Witness A got sick, Kim, Witness C and Witness E drove Witness A back to Panther Village, while Jane Roe stayed alone in Witness E's apartment.

   h. When Kim, Witness C and Witness E returned to Witness E's apartment, Kim, Witness C, and Witness E consumed more alcohol. Jane Roe likely consumed at least five to seven more shots between 2:00 a.m. and 4:45 a.m.

   i. Kim took Jane Roe back to his apartment at around 5:00 a.m.

   j. Kim had vaginal and possibly anal sex with Jane Roe.

   k. Jane Roe and Kim woke up in Kim's bed around 10:30 a.m. on March 16, 2017 and Kim drove Jane Roe to CVS pharmacy to get Plan B medicine.

   l. After Jane Roe got Plan B, Kim drove her back to her dorm.

---

[10] Social House was a bar located at 2208 College Street, Cedar Falls, Iowa.

m. Jane Roe told Witness A and Witness B what happened at Kim's apartment and they subsequently reported it to a RA who brought in a RLC who wrote an Incident Report.

n. Jane Roe, along with Witness A and Witness B, went to Sartori Hospital.

o. While at Sartori Hospital, Jane Roe had a rape kit done.

p. Because Jane Roe was still not feeling well, she went to the Student Health Center on March 21, 2017, where she was told her hymen was torn.

58. The Report also contained exculpatory facts which were **not** included in the "**Conclusions of Fact**" by investigators and **do not** support that Jane Roe was incapacitated when the alleged sexual misconduct occurred. Investigators ignored the following:

a. Witness A told investigators Jane Roe was "normal" at the Social House and was not slurring her words or stumbling when she walked.

b. Witness A told investigators she and Jane Roe both have a good tolerance to alcohol.

c. After texting Kim to come pick them up at the Social House, both Witness A and Jane Roe reported going to Kwik Star and eating chicken and fries.

d. Witness C reported to Jane Roe was not too drunk, but Witness A was very intoxicated. Witness C told investigators Jane Roe was walking fine and she was not slurring her words.

e. Witness C said both Jane Roe and Kim told him they had never seen Witness A so drunk before.

f. Witness E said Witness A was drunk in comparison to Jane Roe.

g. When they got to Witness E's apartment, Witness A told investigators Jane Roe was walking, she seemed fine.

h. After getting sick, Witness A reported that Jane Roe got her stuff and she thinks she gave it to her before she left the apartment.

i. Witness C told investigators that when they arrived at Witness E's apartment Jane Roe and Witness A were walking fine.

20

j.  Witness C told investigators that after they dropped Witness A off at her apartment, they went back to Witness E's apartment and he and Jane Roe started a drinking competition because Jane Roe told him she could drink.

k.  Witness E told investigators that Jane Roe said "I wanna go", but he thought Jane Roe seemed fine.

l.  Kim reported in his voluntary statement[11] to police that he drove Kim to her apartment and they talked in the car for awhile during the car ride. He asked her to go back to his place, and she said yes. They got to my apartment, and Jane Roe took off her shoes, went to Kim's room and sat on his bed. They called Witness D, Kim's roommate to tell him they were there. After sitting a talking for a few minutes, Jane Roe started to cry. Kim told police he sent a text to Witness D that Jane Roe was crying. Jane Roe stopped crying and Kim decided to take her back to her apartment. Kim drove her back to her apartment and they continued to talk on the way there. They parked and walked to the front of Jane Roe's building. Jane Roe could not find her student card to get in to her apartment. Kim asked her to go back to his place and she said yes. Kim drove them back to his apartment. They went to Kim's room and Jane Roe said, "What if Witness D knows[12]?" Jane Roe laid on Kim's bed and Kim laid next to her. Jane Roe climbed on top of Kim, kissed him on mouth, placed her tongue in his mouth and rubbed his penis with her right leg. Kim reported he then took Jane Roe's clothes off and placed his fingers in her vagina. Kim told the police she moaned in response. After a few minutes, Kim took off his clothes and engaged in sexual intercourse with Jane Roe. Kim stopped after a few minutes and put a condom on. Kim started having sexual intercourse again and asked Jane Roe change positions. Jane Roe changed position. Kim reported they both were tired and sleepy so they went to sleep. Kim told police Jane Roe never, throughout the entire sexual encounter, said anything like "No" or showed any negative signs.

m.  Witness D, Kim's roommate, told investigators he had been Kim's roommate since January, 2017, but they were no longer roommates because of personality differences.[13]

n.  Witness D reported Jane Roe was "so drunk."

o.  Witness D told investigators she asked Jane Roe whether it was her decision to be at Kim's apartment and she told him yes, but said so in a "very

_____

[11] It should be noted that contrary to the statements Jane Roe and other witnesses gave to investigators, Kim's voluntary statement to police, without counsel, if untrue carried the possibility of additional criminal charges for lying to the police. This was never mentioned in the credibility analysis by investigators.

[12] There is nothing in the Report to indicate investigators ever followed up with Jane Roe, or any other witness about what that phrase meant, whether Jane Roe and Witness D had a prior relationship, or why she would be concerned about him knowing she came back to Kim's apartment.

[13] There was nothing in the Report to indicate whether Witness D's obvious bias against Kim was a factor for investigators in determining his credibility.

ambiguous way." Despite this, Witness D reported that he thought it was okay to leave so he went back to his room.

p. Jane Roe told investigators she was not having her period during the night of the sexual encounter.[14]

q. After waking up the next morning, Kim reported to police that Jane Roe asked whether they had sex the night before. Kim told her yes and explained that he did not ejaculate inside her. Jane Roe asked where she could get Plan B and Kim drove her to CVS pharmacy and she bought it. Before dropping her off at her apartment, Jane Roe asked Kim, "Do you have special feelings me?" Kim answered, "I don't think it wasn't like that." He told her they could talk about it later and she responded okay.

r. Witness B told investigators that on Thursday, March 16, 2017, she talked to Jane Roe and asked her about going out the night before. Jane Roe responded by saying "it was good."

s. Witness B told investigators that Jane Roe had fear that she may have given consent even though she does not remember.

t. Witness E told investigators he talked to Kim sometime after Spring Break and he was told the sex between Kim and Jane was mutual. Witness E reported Kim also said that the next morning Jane Roe asked him what kind of relationship they were going to have.

u. After going to the hospital, the hospital called police, not Jane Roe. Jane Roe told the police she did not want to press criminal charges.[15]

59. The above referenced inconsistencies in the accounts told by witnesses about Jane Roe's

level of intoxication were never factors in the Investigators incapacitation analysis.

Inexplicably, investigators include Kim's account that the sex with Jane Roe was

consensual and that she initiated the sexual contact and intercourse, but then completely

and intentionally ignore that same account in their "**Conclusions of Fact**" and never

directly questioned Jane Roe's credibility despite numerous reasons to do so.

---

[14] This fact was later proven to be not truthful as she told the hospital staff that she was on her period at the time of the incident. There is nothing in the Report to indicate this inconsistency was ever a factor when investigators determined her credibility.
[15] This fact was completely left out the Report.

60. Also ignored were other statements which corroborate Kim's account that Jane Roe was only concerned with whether or not Kim had feelings for her the morning after, not that any nonconsensual sex had occurred.

61. Finally, and most importantly, investigators ignore in their "Conclusions of Fact" that Kim told Witness B she feared she had given Kim consent even though she did not remember giving it.

62. Based on the totality of the circumstances and **all** the facts the Report, contrary to investigators conclusions, it was not reasonable to presume that Kim should have known that Jane Roe would not have been able to make a rational, reasonable decisions on the night of the sexual encounter.

63. Also contrary to the investigators' conclusions and all the facts in the Report, it was unreasonable to assume Jane Roe, was not able to appreciate her situation and address it consciously, such that any consent was informed by knowing the "who, what, when, where why and how of her situation on the night of the sexual encounter."

## COUNT I

### Violation of Title IX of the Education Amendments of 1972

*(Against Defendant Northern Iowa)*

64. Kim repeats and realleges each and every allegation above as if fully set forth herein.

65. Title IX of the Education Amendments of 1972, provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

23

66. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Northern Iowa.

67. Students attending public universities such as Northern Iowa who have been accused of sexual misconduct, have a right to due process under Title IX. *See* **U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX** (2001) at 22 (the "2001 OCR Guidance"); April 2011 "Dear Colleague" Letter at 12.

68. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student. . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dept' of Justice) (Emphasis Added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[16]

69. The "prompt and equitable" procedures a school must implement include, at a minimum:

    a. "Notice. . . of the procedure, including where complaints may be filed";

    b. "Application of the procedure to complaints alleging [sexual] harassment. . .";

    c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

    d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

---

[16] See generally U.S. Dep't of Education, Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties –Title IX (2001) at 19-20, 21 & 98-101.

e. "Notice to the parties of the outcome of the complaint…."[17]

70. Title IX Officers should be independent and not have a conflict of interest. When designating a Title IX coordinator, a recipient should be careful to avoid designating an employee whose other job responsibility may create a conflict of interest. "For example, designating a disciplinary board member, general counsel, dean of students, or athletics director as the Title IX coordinator may pose a conflict of interest." April 2011 "Dear Colleague" Letter at 7; August 2015 "Dear Colleague" Letter at 2-4.

71. Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

72. An "erroneous and biased outcome" occurred in this case. Kim was wrongly found to have committed a violation of Northern Iowa's Conduct Code, and gender bias was a motivating factor in that decision.

73. Based on the foregoing and series conflicts of interests, Northern Iowa failed to conduct an adequate, reliable, and impartial investigation of Jane Roe's complaint.

74. Northern Iowa also denied Kim's right to due process when: 1) Defendant Williams was in the dual and conflicted role of Dean of Students and a Title IX deputy coordinator; 2) Defendant A. Rafanello was in the dual and conflicted role as Assistant to the Dean of Students, and investigator and her husband, Defendant N. Rafanello was in the dual and conflicted role of Director of Residence Life, and served as chair of the Conduct Review Hearing Board; 3) when Northern Iowa denied Kim, and his lawyer, the right to ask *any* questions of Jane Roe to test her credibility or for the purpose of cross-examination; denied the Conduct Review Hearing board the opportunity to visually see Jane Roe at the

---

[17] *Id.* at 20.

hearing itself in order to evaluate her credibility; 4) denied Kim or his counsel the access to the information, used by investigators in compiling their Report; 5) denied Kim a one-week extension to submit his appeal; 6) denied the Conduct Review Hearing board access to the information used by investigators in compiling their Report; 7) imposed a sanction that was severely disproportionate to the alleged violation; 8) refused to conduct further investigation when Kim provided potential newly discovered evidence on appeal; 8) failed to have Defendant Gutkenecht, the Title IX Officer, approve or disapprove the recommended sanction, contrary to the Conduct Code; and 9) denied Kim Due Process when Defendant Roybal held the dual and conflicted role of deputy Title IX coordinator and the person who reviewed the appeal, and then simply rubber stamped the Hearing Board decision and upheld the expulsion sanction without sufficient review.

75. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous finding and biased decision to impose an unjustly severe penalty upon Kim. These circumstances include, but are not limited to:

 a. Beginning in 2011 and through the time when Jane Roe's complaint was investigated, Northern Iowa was subjected to federal pressure to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct complaints; and issue more severe sanctions to those found responsible for sexual misconduct.

 b. Upon information and belief, Defendants Gutknecht, Williams, A. Rafanello, and Roybal, and perhaps others assigned in the disciplinary process, received "trauma-informed investigation" training which perpetuated the idea that female victims of sexual assault should never be questioned, that trauma excuses all memory lapses

and credibility issues and that female complainants always tell the truth. This approach caused Defendant A. Rafanello and Gary Robinson to overlook profound inconsistencies in Jane Roe's account of the rape allegation and to "cherry pick" **Conclusions of Fact** for their Report, which supported that Jane Roe was incapacitated and unable to consent and purposely ignored exculpatory facts on the issue of consent and incapacitation.

c. All but two of the individuals assigned to investigate Jane Roe's complaint and/or assure compliance with Title IX, were female. Of the two-males assigned, one had a clear conflict of interest in that his wife was one of the investigators.

76. Upon information and belief, Defendant Northern Iowa has not modified its disciplinary procedures under the present Trump Administration even though, on September 22, 2017, the OCR withdrew the April 2011 "Dear Colleague" Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 2014 on the ground that the April 2011 "Dear Colleague" Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "lack the most basic elements of fairness and due process and are overwhelmingly stacked against the accused." *See* https://www2.ed.gov/about/offices/list.ocr/letters/colleague-title-ix-201709.pdf.

77. Upon information and belief, Defendant Northern Iowa has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct.

78. Upon information and belief, Defendant Northern Iowa's mishandling of Jane Roe's rape allegation was informed by internal institutional pressure as well as external pressure

from the United States Department of Education, under a threat of possible rescission of federal funds.

79. Based on the foregoing, Kim was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to hold him, because he was male, responsible for sexual misconduct and then punish him severely for it.

80. As a direct and proximate result of the above conduct, Kim sustained damages including, without limitations, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, the loss of his immigration status, threat of deportation, economic injuries and other direct and consequential damages.

81. As a result of Northern Iowa's violation of Title IX, which resulted in an unduly severe and unwarranted sanction that continues to injure Kim's reputation and right to continue his education, an injunction should issue directing Northern Iowa to 1) reverse the outcome and findings regarding Jane Roe's complaint; 2) expunge Kim's disciplinary record; 3) remove an record of Kim's expulsion from his education file; 4) allow Kim to return to Northern Iowa at a time of his choosing in order to complete the remaining credit hours he needs for receiving a degree without the imposition of any conditions for readmission to the University.

82. As a result of the foregoing, Kim is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.

## COUNT II

### 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process

*(Against Defendants Northern Iowa, Nook, Gutknecht, Williams, Roybal, Knudsen, N. Rafanello, and A. Rafanello)*

28

83. Kim repeats and realleges each and every allegation above as if fully set forth herein.

84. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

85. Section 1983 of Title 42 of the U.S. Code provides in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or Usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

86. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.[18]

87. Kim's constitutionally protected property interest included his right to enrollment at Northern Iowa free from arbitrary and biased expulsion arises from the policies, courses of conduct, practices and understanding established by Northern Iowa under color of state law.

88. Kim's constitutionally protected property interest further arises from the express and implied contractual relationship he had with Northern Iowa.

89. It is well established that Fourteenth Amendment Due Process protections are required in higher education disciplinary proceedings.

90. Northern Iowa, a State university, is part of the State of Iowa educational system, with its principal offices in Cedar Falls, Iowa. Northern Iowa is authorized, supervised and funded by the State of Iowa, pursuant to Iowa Code § 262.7. Northern Iowa has a duty to

---

[18] *See generally, Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

provide its students equal protection and due process of law by and through any and all procedures set forth by the University.

91. Kim obeyed all institutional rules yet he was wrongfully expelled from Northern Iowa.

92. Kim was entitled to Due Process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Kim was deprived of a fundamentally fair process. Kim's right to due process was violated when:

    a. Defendant Gutknecht assigned Defendant A. Rafanello as an investigator, who had a clear conflict of interest which prevented her from being fair and impartial as she was married to Defendant N. Rafanello, the Chair of the Conduct Review Board;

    b. Defendant Williams was in the dual and conflicted role of Dean of Students and a Title IX deputy coordinator;

    c. Defendant Williams designated Defendant N. Rafanello as Chair of the Conduct Review Hearing Board, who had clear conflict of interest which prevented him from being fair and impartial because he was married to Defendant A. Rafanello who investigated the complaint and made formal recommendations to the Conduct Review Board. Defendant N. Rafanello was also conflicted because, prior to his appointment as Chair of the Conduct Review Board, he had been expressly exposed to Jane Roe's biased and inaccurate version of the incident as part of the reporting process. Further, Defendant N. Rafanello was Director of Residence Life and was in direct line of supervision over Jane Roe's employment;

    d. Denied Kim, and his lawyer, the right to ask questions of Jane Roe to test her credibility or for the purpose of cross-examination;

e. Denied the Conduct Review Hearing board the opportunity to visually see Jane Roe at the hearing itself in order to evaluate her credibility;

f. Denied Kim or his counsel the access to the information or "evidence", used by investigators in compiling their twenty-five (25) page report for purposes of an appeal;

g. Denied Kim a one-week extension to submit his appeal;

h. Denied the Hearing Board access to the information or "evidence" used by investigators in compiling their report and making their Conclusions of Fact;

i. Imposed a sanction that was severely disproportionate to the alleged violation;

j. Denied Kim's request to conduct further investigation when he provided potential newly discovered evidence on appeal; and

k. Designated Defendant Roybal in the dual role and conflicted role of Title IX Deputy Coordinator as the person who reviewed Kim's appeal, who then simply "rubber stamped" the findings and conclusions of the Report and Hearing Board as her own and upheld the expulsion sanction.

l. Prepared a Report that "cherry picked" facts and erroneously concluded without substantial evidence that Jane Roe was incapacitated at the time of the alleged rape; and

m. Conducted a Board Hearing which did not evaluate the evidence utilizing the incapacitation standard from the Policy and ignored evidence which was exculpatory to Kim.

93. Northern Iowa deprived Kim of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair adjudication, his right to

be heard by an impartial factfinder, to question his accuser, to challenger her credibility and the credibility of other adverse witnesses and to adequately present evidence and witnesses of his defense.

94. Northern Iowa failed to provide Kim with the basic Due Process protections that it was required to provide students accused of sexual misconduct at a state university.

95. Northern Iowa, Defendant(s) Nook, Gutknecht, Williams, Roybal, A. Rafanello, N. Rafanello, as well as other agents, representatives and employees of Northern Iowa intentionally, willfully, wantonly, oppressively and maliciously violated Kim's due process rights.

96. Northern Iowa deprived Kim of the requisite Due Process because Northern Iowa had a pecuniary interest in the outcome of the adjudication. Specifically, Northern Iowa risked the loss of federal funds or other penalty if they found in favor of Kim.

97. Based on the foregoing, Northern Iowa violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Jane Roe's complaint.

## COUNT III

## State Law Breach of Contract

(*Against Defendant Northern Iowa*)

98. Kim repleads and realleges each and every allegation above as though fully set forth herein.

99. At all relevant times hereto, a contractual relationship exited between Northern Iowa and Kim through Northern Iowa's policies and procedures governing the student

32

disciplinary system, including but not limited to the Student Conduct Code and the OCEM Policies and Procedures.

100. Through the documents it publishes and provides to students, Northern Iowa makes express contractual commitments to students involved in a disciplinary process.

101. Based on the foregoing, Northern Iowa created express and implied contracts with Kim.

102. The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceeding would be conducted with basic fairness.

103. Based on the aforementioned facts and circumstances, Northern Iowa breached and violated the covenant of good faith and fair dealing implied in an agreement with Kim.

104. As a direct and foreseeable consequence of the foregoing breaches, Kim sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

105. As a result of the foregoing, Kim is entitled to damages in an amount to be determined at trial.

106. Kim satisfied all requirements for filing this action pursuant to Iowa Code Chapter 669.

## DAMAGES

107. As a direct and proximate cause of Defendants' acts and omissions as set forth herein, Kim sustained the following damages in excess of the jurisdictional requirement of this Court:

    A. Past and future emotional pain and suffering in an amount to be proven at trial;

    B. Past and Future loss of enjoyment of life in an amount to be proven at trial;

33

C.  Past and Future economic damages related to his illegal expulsion;

D.  Removal and expulsion from Northern Iowa (for which injunctive relief should be afforded);

E.  Attorney fees and costs for all claims for relief pursuant to 42 U.S.C. §§ 1983 and 1988;

F.  All allowable costs, expenses and fees association with this litigation.

**JURY DEMAND**

Plaintiff Kim, by and through his attorney, hereby requests a trial by jury in the above-entitled cause of action.

Respectfully Submitted,

__/s/_____
Thomas P. Frerichs AT0002705
P.O. Box 328
106 East 4th Street
Waterloo, Iowa 50704-0328
Phone: (319) 236-7204
FAX: (319) 236-7206
tfrerichs@frerichslaw.com
ATTORNEY FOR PLAINTIFF

34