# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| DONGHYUK KIM | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:19-cv-02037-CJW-KEM |
| | ) | |
| vs. | ) | **PLAINTIFF'S RESISTANCE TO** |
| | ) | **DEFENDANTS' MOTION TO DISMISS** |
| THE UNIVERSITY OF NORTHERN | ) | |
| IOWA, MARK A. NOOK, President of the | ) | |
| University of Northern Iowa in his | ) | |
| official capacity, LEAH GUTKNECHT, | ) | |
| in her individual and official capacities, | ) | |
| CHRISTINA ROYBAL, in her individual | ) | |
| and official capacities, LESLIE K. | ) | |
| WILLIAMS, in her individual and | ) | |
| official capacities, PAULA KNUDSON, | ) | |
| in her official capacity, NICHOLAS | ) | |
| RAFANELLO, in his individual and | ) | |
| official capacities, ALLYSON | ) | |
| RAFANELLO, in her individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS

Introduction…………………………………………………………………………………..2

The Allegations of the Complaint………………………………………………………...3

Argument…………………………………………………………………………………8

    I.    Legal Standard for 12(b)(6) Motion……………………………………8

    II.    Plaintiff Alleged Plausible Title IX Claims……………………………………8

        A. Plaintiff Plausibly Alleged an Erroneous Outcome Claim……………………9

            1. Plaintiff Alleged Gender-Bias in the Decision-Making Process……………………………………………………………………9

2. Plaintiff Alleged That Pressure On UNI Created A Backdrop for Gender-Bias……………………………………………………………………13

3. The Use of a Trauma-Informed Approach Supports an Inference of Gender-Bias……………………………………………………………...15

B. Plaintiff Alleged A Plausible Selective Enforcement Claim……………...…16

III. Plaintiff Alleged A Plausible Procedural Due Process Claim………………...17

A. Plaintiff Was Not Required to Exhaust His Post-Deprivation Remedies……18

B. The Due Process Claim Against the Individual Defendants Is Not Barred By the Doctrine Of Qualified Immunity………………………………………19

1. Plaintiff Had A Clearly Established Right to An Impartial Process….......20

2. Plaintiff Had A Clearly Established Right to Review the Evidence Against Him……………………………………………………………………23

3. Plaintiff Had A Clearly Established Right of Cross-Examination……….24

C. Kim's Official Capacity Claims Should Not Be Dismissed……………..…..25

IV. Kim Plausibly Alleged A Breach of Contract Claim……………………………26

Conclusion……………………………………………………………………………29

## INTRODUCTION

Plaintiff Donghyuk Kim (hereinafter "Plaintiff" or "Kim") respectfully submits this brief in support of his Resistance to Defendants' Motion to Dismiss his First Amended Complaint pursuant to Rule 12(b)(6).

The relevant facts are fully set forth in Plaintiff's First Amended Complaint, filed with the Court on September 17, 2019, in which Plaintiff alleges claims against: i) The University of Northern Iowa ("UNI") for violations of Title IX of the Education Amendments of 1972 and breach of contract; ii) against individual Defendants Leah Gutknecht ("Gutknecht"), Christina Roybal ("Roybal"), Leslie K. Williams ("Williams"), Paula Knudson ("Knudson"), Nicholas

Rafanello ("N. Rafanello"), and Alyson Rafanello ("A. Rafanello"), pursuant to 42 U.S.C. § 1983, for money damages resulting from their violations of his right to procedural due process under the Fourteenth Amendment to the U.S. Constitution; and iii) for injunctive relief against Mark A. Nook ("Nook"), Gutknecht, Roybal, Williams, Knudson, N. Rafanello and A. Rafanello in their official capacities, pursuant to 42 U.S.C. § 1983, for violations of his right to procedural due process under the Fourteenth Amendment to the U.S. Constitution.

As fully set forth below, Plaintiff has plausibly alleged these claims and the Court should deny Defendants' motion in its entirety.

## THE ALLEGATIONS OF THE COMPLAINT

### A.     Plaintiff's Background

While attending UNI, and until Jane Roe falsely accused him of sexual misconduct, Plaintiff had no prior disciplinary record and was well positioned to graduate. At the time of the allegations, he was a sophomore, foreign exchange student from South Korea studying accounting. AC ¶ 37.[1] His plans to graduate from UNI, and career plans, were sidelined when UNI found him responsible for non-consensual sexual intercourse with Jane Roe and expelled him. *Id.* ¶ 74, 84-85. Plaintiff was also criminally prosecuted with respect to Jane Roe's allegations and, on November 21, 2017, a jury of his peers acquitted him of all charges. *Id.* ¶ 8-9

### B.     Plaintiff's Relationship with Jane Roe

Kim and Jane Roe became friends during the 2016-17 winter break, when they were introduced at an event for Korean students. *Id.* ¶ 48. Kim provided rides to Wal-Mart to Roe and other Korean students on campus. *Id.*  The two socialized a couple of times in a group setting. *Id.*

---

[1] Plaintiff's First Amended Complaint will be cited herein as "AC."

3

On March 15, 2017, Jane Roe and a friend went to a local bar and contacted Kim in the early morning hours, asking for a ride back to campus. *Id.* ¶ 49. After picking them up, Kim and his friends, along with Roe and her friend, traveled to a convenience store and then to an apartment nearby. *Id.* ¶ 86. At the apartment, Roe and Kim consumed alcohol. *Id.* Kim eventually took Jane Roe back to her apartment and the two sat in the car talking for a while. Kim asked Roe to come back to his apartment and she agreed. *Id.* ¶ 51.

When they arrived at Kim's apartment, Roe took off her shoes and went to Kim's room and sat on his bed. *Id*. Together they called Kim's roommate to let him know they were there. *Id.* Kim reported to police that after sitting on his bed and talking for a few more minutes, Roe began to cry when talking about her friend who was sick. *Id.* Roe stopped crying and Kim decided to take Roe back to her apartment again. *Id.* ¶ 52. Kim and Roe talked in the car on the ride to her apartment. *Id.* ¶ 53. Kim parked and he walked Roe to the front of her apartment building. *Id.* Roe could not find her key card to get in to the apartment. *Id.* Kim asked Roe whether she wanted to go back to his apartment and Roe again agreed. *Id.*

After arriving at Mr. Kim's apartment for the second time, Roe and Kim went to his room. *Id.* ¶ 54. Roe and Kim then laid on his bed and Roe initiated sexual contact with Kim. *Id.* ¶ 54-55. Kim reported to police that Roe never told him to stop, that she participated in the sexual activity, and never expressed "any negative signs" which would lead a reasonable person to believe the sex was nonconsensual. *Id.*

## C.   Jane Roe's Sexual Misconduct Complaint Against Kim

On March 16, 2017, Jane Roe reported allegations that Mr. Kim had sexually assaulted her to a resident advisor at the University. *Id.* ¶ 58. The resident advisor then emailed out an incident report. *Id.* The e-mail purported to describe what Roe told the resident advisor, described the nature

4

of the report as "sexual harassment/misconduct," and the urgency of the report as "critical." *Id.* The incident report was e-mailed to N. Rafanello, Gutknecht, Williams and A. Rafanello. *Id.* ¶ 59. The resident advisor also contacted N. Rafanello directly, due to his role as Director of Residence Life, to inform him of Jane Roe's allegations against Kim. *Id.* ¶ 60.

On March 21, 2017, Gutknecht, UNI's Title IX Officer and Assistant Dean of Students, met or conferred with N. Rafanello, who expressed the view that criminal charges were or should be filed against Kim and advised his staff about issuing crime alerts related to the incident. *Id.* ¶ 62.

On March 23, 2017, Jane Roe filed a formal complaint with UNI alleging nonconsensual sexual intercourse by Kim. Gutknecht met with Jane Roe in this regard. Gutknecht's notes from the meeting show that Roe was presented with a copy of the policy on sexual misconduct and allowed to pick which policy violation occurred. This was contrary to UNI's Sexual Misconduct Policy[2] which states that the Title IX or deputy coordinator is required to make the initial determination as to whether the information in the complaint has enough merit to reasonably indicate there may have been a violation of policy. *Id.* ¶ 63.

On March 24, 2017, Gutknecht assigned two investigators: Gary Robinson (herein "Robinson") and A. Rafanello, who were reportedly "trained civil rights investigators." *Id.* ¶ 64. Pursuant to the Sexual Misconduct Policy, Robinson and A. Rafanello were required to "thoroughly and impartially interview relevant parties and witnesses and obtain available evidence." *Id.* ¶ 65.

On May 18, 2017, Gutknecht received the investigative report from Robinson and A. Rafanello. *Id.* ¶ 69. In violation of the Sexual Misconduct Policy, Gutknecht failed to render the

---

[2] UNI's Policy "1302 Discrimination, Harassment and Sexual Misconduct Policy" is referred to herein as the "Sexual Misconduct Policy."

required decision to approve or disapprove the investigative report, and, instead, requested edits. *Id.* A series of edits were made, including by legal counsel, and a Notice of Outcome was completed on June 2, 2017, without the investigative report ever being formally approved or disapproved by Gutknecht. *Id.*

The investigation report contained evidence that favored Plaintiff's account of what happened: i) a witness reported that the day after Jane Roe's encounter with Plaintiff she spoke with Jane Roe who said that her night was "good" and that Jane Roe ***believed she may have consented to sex with Plaintiff*** (AC ¶ 96.o.p.); and ii) a number of witnesses to Jane Roe's behavior on the night in question indicated that she was walking, talking and seemed "fine" (AC ¶ 96). Despite reviewing this evidence, the investigators found that it was reasonable to assume that Plaintiff should have known that Jane Roe was unable to consent and could not have been able to consciously decide to have sex with Plaintiff (AC ¶ 87).

The investigators declined to make a credibility assessment of Plaintiff since "he chose not to meet with investigators." This failed to recognize the credibility of Plaintiff's written statement—which the Title IX investigators had—because Plaintiff voluntarily provided that statement to police without counsel present. (AC ¶¶ 93, 97-98). Per Plaintiff's account to police, he and Jane Roe spent considerable time together during the evening on which they had sex. (AC ¶¶ 49-53). Jane Roe initiated sexual contact with Plaintiff while they were laying on his bed and made no movements or said anything that would lead one to believe that the sex was not consensual. (AC ¶¶ 55-56). Plaintiff also stated that on the morning after the encounter he drove Jane Roe home and, on the way, she stopped to get Plan B. During the drive she asked Plaintiff if he had feelings for her, to which he said no. (AC ¶ 96.n). A witness confirmed that Jane Roe's concern the next day was whether Plaintiff had feelings for her (AC ¶ 98)

The investigation report also contained highly prejudicial statements, including that Jane Roe's hymen was torn. *Id.* ¶¶ 86.p., 92.

On June 13, 2017, Williams informed Kim in a written letter that he was named in a Student Conduct referral for a possible violation of community standards and scheduled a Conduct Board Hearing for June 19, 2017. *Id.* ¶ 70. Williams explicitly informed Kim that the scope of the hearing would be limited to the investigation report and that he could only ask "clarifying" questions about the report. He could not cross-examine Jane Roe. *Id.* ¶ 70.

Williams selected N. Rafanello as chair of the three (3) member Conduct Board, knowing that N. Rafanello was Title IX investigator A. Rafanello's husband. *Id.* ¶ 70, footnote 15. N. Rafanello, thus, reviewed his wife's investigative report in order to make a determination as to whether Kim was responsible for violating UNI's Sexual Misconduct Policy.

The Conduct Board hearing was convened on June 19, 2017. *Id.* On June 23, 2017, Williams informed Plaintiff that he was found responsible for violating the Sexual Misconduct Policy, for having non-consensual sexual intercourse and sexual contact with Jane Roe while she was incapacitated. *Id.* ¶ 71.

On June 23, 2017, Williams told Gutknecht to extend Jane Roe's response time for any appeal submitted by Plaintiff. *Id.* ¶ 72. On June 28, 2017, Kim requested a one-week extension to submit his appeal which Gutknecht denied. *Id.* ¶¶ 73-74. Kim submitted his appeal on June 30, 2017. *Id.* ¶¶ 78-80. On July 7, 2017—after he had submitted his appeal—Gutknecht provided Kim with a "Deliberation Report" which discussed the Conduct Board's decision, but provided no rationale for it. *Id.* ¶ 81.

On August 8, 2017, Roybal, a deputy Title IX coordinator and the person responsible for reviewing Kim's appeal, sent a letter to Kim denying his appeal. *Id.* ¶ 84. On August 10, 2017,

Gutknecht informed Kim in writing that his expulsion was "final" and he was not entitled to any further appeals. *Id.* ¶ 85.

## ARGUMENT

### I.    The Applicable Legal Standard

As stated by this Court in *Moore v. Healthcare of Iowa, Inc.*, No. 16-cv-1021-CJW, 2016 WL 6518446, at *3 (N.D. Iowa Nov. 2, 2016) (Williams, C.J.):

> 'When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.' *Erickson v. Pardus*, 51 U.S. 89, 94 (2007). It must also 'grant all reasonable inferences from the pleadings in favor of the nonmoving party.' *United States v. Any & All Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000). To survive a motion to dismiss, then, the complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' *Iqbal*, 556 U.S. at 678. 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.* While plausibility is not equivalent to probability, it is something 'more than the sheer possibility that a defendant has acted unlawfully.' *Id.* 'The question ... is not whether [the plaintiff] might at some later stage be able to prove [a claim]; the question is whether [the plaintiff] has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims.' *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1129 (8th Cir. 2012) …. A court must also assess 'plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation,' *Zoltech Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010), 'draw[ing] on [its own] judicial experience and common sense.' *Iqbal*, 556 U.S. at 679.

The plausibility standard set forth in *Iqbal* and *Twombly* does not preclude pleading claims based on "information and belief" where the facts are peculiarly within the possession and control of the defendant. *See Van Stelton v. Van Stelton*, 2013 WL 3776813, at *10 (N.D. Iowa July 17, 2013) (Bennett, J.) (collecting cases).

### II.   <u>Plaintiff Alleged Plausible Title IX Claims</u>

Defendants seek to dismiss Plaintiff's Title IX Claim (Count I) on the grounds that: i) Plaintiff has failed to plausibly allege an erroneous outcome claim because did not adequately

plead that gender bias was a motivating factor in UNI's decision to expel him; and ii) he cannot allege a selective enforcement claim on information and belief. These arguments fail, and accordingly, the Court should deny Defendants' motion to dismiss this claim.

### A.  Plaintiff Plausibly Alleged an Erroneous Outcome Claim

Under an "erroneous outcome" theory, the plaintiff claims that he was innocent and wrongly found to have committed an offense.[3] In order to establish a violation of Title IX under an "erroneous outcome" theory, a plaintiff must show (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994). Defendants do not dispute that Plaintiff has alleged sufficient facts to cast articulable doubt on the accuracy of the outcome of Plaintiff's disciplinary proceeding, they only argue that Plaintiff has failed to allege gender bias. *See* Moving Br. at 7-13.

### 1.  Plaintiff Alleged Gender-Bias in the Decision-Making Process

A Title IX plaintiff need only plead "specific facts that support a *minimal plausible inference* of [gender] discrimination." *Doe v. Columbia U.*, 831 F.3d 46, 56 (2d Cir. 2016). (emphasis added). In that regard, "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* at 57. Accordingly, "alternative explanations [for the University's findings] are not fatal to [Plaintiff]'s ability to survive a Rule 12(b)(6) motion." *Doe v. Baum*, 903 F.3d 575, 587 (6th Cir. 2018).

---

[3] Plaintiff makes this allegation at Paragraph 117 of the Amended Complaint. He further alleges that he had consensual sexual intercourse with Jane Roe and that he provided a statement to this effect to the police, without counsel present, because he knew he did not do anything wrong. AC ¶ 56. *See also* AC ¶¶ 97-98. This statement was voluntarily provided to UNI's Title IX investigators. AC ¶ 57. For reasons unknown, despite these clear allegations, Defendants open their Moving Brief with the false assertion that "Plaintiff does not directly deny that he sexually assaulted a fellow student." *Id.* at 2. In fact, *Jane Roe* told a witness in the investigation that she believed she may have *consented* to having sex with Plaintiff. AC ¶ 96 o.p.

9

Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F. 3d at 715. *See also Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017). For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Columbia U.*, 831 F.3d at 57. *See Norris v. CU Boulder*, 2019 WL764568, at ** 8-9 (D. Colo. 2019). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 586 (E.D. Va. Mar. 14, 2018). *See Doe v. Grinnell College*, 4:17-cv-00079, SJ Opinion, ECF No. 159, at pp. 24-27.

At least one court has also found that allegations that the plaintiff was subsequently acquitted of criminal charges involving the same sex act at issue in a college's Title IX investigation support a plausible inference of gender bias in support of an erroneous outcome claim. *Rolph v. Hobart and William Smith Colleges*, 2017 WL 4174933, at * 12 (W.D.N.Y. Sept. 20, 2017). Here, Plaintiff has alleged facts which support a plausible inference of gender bias:

Plaintiff alleged that: i) Title IX investigator A. Rafanello had conflicts of interest and was potentially biased against Plaintiff because she also served as Assistant Dean of Students, was involved in the intake of Jane Roe's initial report, and is married to N. Rafanello, who assumed, without hearing from Plaintiff, that Plaintiff should face criminal charges (AC ¶¶ 20, 58, 62); ii) N. Rafanello had conflicts of interest and potential bias against Plaintiff because he was involved in the initial intake of Jane Roe's complaint, made the assumption that Plaintiff would be charged criminally before getting Plaintiff's side of the story, was married to Title IX investigator A. Rafanello, and chaired Plaintiff's Conduct Board hearing, at which he was responsible for

reviewing his wife's investigative report (AC ¶¶ 19, 58-59, 62, 70, 118.m.); iii) Gutknecht conferred with N. Rafanello prior to meeting with Jane Roe about her allegations and then allowed Jane Roe to select the charges against Plaintiff (AC ¶¶ 62-63); and iv) Roybal, who decided Plaintiff's appeal, played conflicting roles in Plaintiff's case because as a Deputy Title IX Coordinator she was also responsible for ensuring UNI's compliance with Title IX (AC ¶ 16).

Plaintiff further alleged that: i) Gutknecht permitted Jane Roe to choose the charges against Plaintiff, in violation of UNI's Sexual Misconduct Policy (AC ¶¶ 62-63); ii) Williams limited the scope of Plaintiff's hearing, precluding him from cross-examining Jane Roe through the Conduct Board (AC ¶ 70); iii) Williams told Gutknecht to automatically extend Jane Roe's time to respond to Plaintiff's appeal while Gutknecht automatically denied Plaintiff's request for a one-week extension to file his appeal (AC¶¶ 72-77);[4] iv) Roybal rubber-stamped Plaintiff's appeal (AC ¶ 118.q); and v) Gutknecht withheld the Conduct Board's Deliberation Report from Plaintiff until *after* he submitted his appeal (AC ¶¶ 80-82).[5]

Plaintiff also alleged that he was found responsible for nonconsensual sexual intercourse and sexual contact with Jane Roe even though the evidence favored Plaintiff's account of what happened. (AC ¶¶ 71, 86-101, 119). The Title IX investigation report, which was the subject of Plaintiff's hearing, clearly showed that the evidence did not support the allegations, or finding, against Plaintiff because: i) a witness reported that the day after her encounter with Plaintiff she

---

[4] Defendants' assertion that the letter sent by Plaintiff's attorney on July 7, 2017 negates any allegation of unequal treatment of Plaintiff as compared to Jane Roe is unavailing. *See* Moving Br, at 2. This correspondence was sent subsequent to the submission of Plaintiff's appeal and does not change that Williams and Gutknecht automatically extended Jane Roe's response time while near-simultaneously denying Plaintiff's extension request. AC ¶¶ 71-73, 83. This occurred *weeks prior* to Plaintiff's new counsel sending the July 14, 2017 letter or Gutknecht providing any purported extension of time. The clear message was that the deadlines mattered for Plaintiff but not Jane Roe.
[5] These allegations directly contradict Defendants' bald assertion that Plaintiff does not allege how he was prejudiced by the conflicts at play in his Title IX proceedings. *See* Moving Br. at 12. *Winter v. Pennsylvania State U.*, 172 F. Supp. 3d 756, 770 (M.D. Penn. 2016), is inapposite because in *Winter* the plaintiff only alleged the existence of a conflict. *See also Doe v. Purdue U.*, 281 F. Supp. 3d 754, 779 (N.D. Ind. 2017) (same).

spoke with Jane Roe who said that her night was "good" and that Jane Roe believed she may have consented to sex with Plaintiff (AC ¶ 96.o.p.);[6] and ii) a number of witnesses to Jane Roe's behavior on the night in question indicated that she was walking, talking and seemed "fine" (AC ¶ 96).[7] Despite reviewing this evidence, the investigators found that it was reasonable to assume that Plaintiff should have known that Jane Roe was unable to consent and could not have been able to consciously decide to have sex with Plaintiff (AC ¶ 87). The report was then the sole evidence reviewed by the Conduct Board and the sole subject of the hearing (AC ¶¶ 70, 118.e.).

Plaintiff further alleged that the investigators declined to make a credibility assessment as to Plaintiff since "he chose not to meet with investigators." This ignored that Plaintiff, who was then facing criminal charges, did not have a choice. It also failed to recognize the credibility of Plaintiff's written statement—which the Title IX investigators had—because Plaintiff voluntarily provided that statement to police without counsel present. (AC ¶¶ 93, 97-98). Per Plaintiff's account to police, he and Jane Roe spent considerable time together during the evening on which they had sex. (AC ¶¶ 49-53). Jane Roe initiated sexual contact with Plaintiff while they were laying on his bed and made no movements or said anything that would lead one to believe that the sex was not consensual. (AC ¶¶ 55-56).[8] Plaintiff also stated that on the morning after the encounter he drove Jane Roe home and, on the way, she stopped to get Plan B. During the drive she asked Plaintiff if he had feelings for her, to which he said no. (AC ¶ 96.n). Another witness confirmed that Jane Roe's concern the next day was whether Plaintiff had feelings for her (AC ¶ 98).[9]

---

[6] *See* Defs. Attachment 1, at p. 18. Notably, the investigation report shows that while Jane Roe could purportedly not remember whether she consented, she recounted the type of sex that allegedly occurred with Plaintiff as well as how she felt during sex. *See* Defs. Attachment 1, at 10, 11, 18

[7] One witness, Plaintiff's roommate gave a statement to investigators in which he asserted that Jane Roe was very drunk. The roommate, Witness D, also said that he and Plaintiff had personality differences, which was not questioned by investigators. Defs. Attachment 1, at 12-14. Witness D told investigators that he knew that Jane Roe and Plaintiff initially left the apartment and then came back. He told Jane Roe that "he could not imagine they had come back."

[8] *See* Attachment 1, at p. 11.

[9] *See* Defs. Attachment 1, at p. 20.

12

Apart from the fact that the evidence did not support Jane Roe's claim of nonconsensual sexual intercourse, the investigation report contains facts that suggest that the Title IX investigators had outdated and discriminatory views concerning gender and sexuality. The first indicator is that the investigators referenced Jane Roe's torn hymen as evidence in support of their finding, which suggests a belief that a woman who is a virgin would not consent to a casual encounter with Plaintiff (AC ¶ 86.p.). The second indicator is that the investigators ignored Plaintiff's sworn statement to police that Jane Roe initiated sexual contact with him (AC ¶ 55-56), suggesting a belief that females are passive in sexual encounters. That Jane Roe initiated the sexual encounter was also supported by Plaintiff's, and others, statements that her primary concern after the encounter was whether or not Plaintiff had feelings for her. (AC ¶¶ 98).

Finally, Plaintiff was acquitted by a jury of the same charges brought against him through UNI's Title IX process. (AC ¶¶ 8-10).

The totality of these circumstances plausibly allege that gender bias was a motivating factor in UNI's decision to expel Plaintiff and, accordingly, Defendants' motion to dismiss should be denied.

## 2. Plaintiff Alleged That Pressure on UNI Created A Backdrop for Gender Bias

Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias. *Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018) (external pressure combined with hearing board's credibility determinations in favor of females on a cold record raised plausible inference of gender bias). *See also Miami U.*, 882 F.3d at 592-93 (plausible inference of gender bias where *inter alia*

university faced pressure to zealously "prosecute" male respondents after facing lawsuit by female student).

Here, Plaintiff alleged that: i) in May 2011, UNI was cited by the U.S. Department of Education ("DE") as 1 of only 3 universities that were in violation of the Clery Act and the Department called for civil penalties against the University (AC ¶ 29); ii) in December 2011, UNI was publicly criticized and faced a lawsuit concerning its mistreatment of a female victim of sexual assault, causing it to conduct an audit of its Title IX practices (AC ¶ 30); iii) in March 2013, UNI settled a lawsuit with a former student who alleged that administrators reacted poorly after she filed a report of being sexually assaulted in her dorm room (AC ¶ 31); iv) in March 2013, DE fined UNI $110,000 for Clery Act violations for denying "the campus community important information regarding due process and fundamental fairness in disciplinary proceedings;" (AC ¶ 32); v) in April 2015, the student newspaper reported that UNI had conducted an administrative review and altered its hearing panel model in sexual misconduct in response to 2014 Guidance from the Office for Civil Rights ("OCR") (AC ¶ 35)[10]; and vi) in April 2015, Gutknecht said in a statement to the student newspaper that all that was needed in sexual misconduct cases was a minimal conduct board to review an investigation report because "there's no need to bring back parties to retell the story" (AC ¶ 36). These allegations, and the allegations set forth *supra* Point II.A.1, together create a sufficient "backdrop" for an inference of gender bias at the pleading stage.

Defendants allege that any pressure placed on UNI, had to occur at, or close to, the time in which Plaintiff's Title IX proceedings occurred. Moving Br. at 10-11. This is not a pleading requirement. In *Miami University*, 882 F.3d at 594, the Court found that the plaintiff's allegations of pressure placed on the university by the federal government, a lawsuit brought by a female

---

[10] Notably, the 2014 Guidance advised universities to conduct hearings in a manner that does not cause additional trauma for the complainant. AC ¶ 33.

Case 6:19-cv-02037-CJW-KEM   Document 46   Filed 11/06/19   Page 14 of 29

student, and corresponding criticism—dating back between 2011 and 2013—sufficiently stated a claim for gender bias in regard to the plaintiff's 2014 disciplinary proceedings. *Id. See also Harnois v. University of Mass. at Dartmouth*, 2019 WL 5551743, at *4 (D. Mass. Oct. 28, 2019).

Defendants further argue that there is no indication that University administrators noted any concern about complying with federal law or had any reason to be "particularly sensitive." Moving Br. at 11. On the contrary, Plaintiff alleged that, in response to the various pressures cited in the Complaint, the University publicly announced that it would conduct an audit of its Title IX policies and practices (AC ¶ 30), that it changed its conduct panel composition and Title IX process in response to OCR guidance (AC ¶ 35), and that Gutknecht, who participated in Plaintiff's Title IX proceedings, noted that the change reflected the University's concerns about bringing parties back in to re-tell the story (AC ¶ 36).

For the above stated reasons, Plaintiff has plausibly alleged that the pressure placed on UNI in the years leading up to the Title IX disciplinary proceedings created a backdrop against which gender bias can be inferred given the other conflicts, biases and procedural infirmities that Plaintiff has alleged.

### 3. The Use of a Trauma-Informed Approach Supports an Inference of Gender Bias

Defendants argue that UNI's use of a trauma-informed approach in Title IX proceedings is insufficient evidence of gender-bias. Moving Br. at 9. As pointed out in *Rossley v. Drake U.*, 344 F. Supp. 3d 927-928 (S.D. Iowa 2018), a *summary judgment* opinion cited by Defendants, a trauma-informed approach may support an inference of gender bias if there is evidence of gender bias in its application. *Id.* Recently, in *Norris v. CU Boulder*, 2019 WL 764568, at *9, the court found that allegations that a university administrator "improperly used a trauma-informed approach" and overlooked inconsistencies in a complainant's account, were facts that supported a

15

claim of gender bias at the motion to dismiss stage. Similar to the plaintiff in *Norris*, Plaintiff, here, has alleged that UNI was required to adopt a trauma-informed approach in response to OCR Guidance (AC ¶ 33), that the administrators involved in his Title IX proceedings were trained in this approach (AC ¶¶ 118.b., 119.b.), and that the manner in which they employed this approach was gender-biased because it caused them to discredit Plaintiff's statement to police while overlooking a number of inconsistencies in Jane Roe's account, including her admission that she may have given Plaintiff consent (AC ¶¶ 99, 119 a., b). At this stage of the action, these allegations are sufficient to support Plaintiff's claim of gender bias.

For all of the above-stated reasons, the Court should deny Defendants' motion to dismiss Plaintiff's Title IX erroneous outcome claim.

**B.**     <u>**Plaintiff Alleged a Plausible Selective Enforcement Claim**</u>

Defendants assert that Plaintiff's selective enforcement claim should be dismissed because he fails to specifically identify a female comparator who was treated more favorably by UNI and, instead, alleges his claim on information and belief. Moving Br. at 13-14. It is well established that a claim may be pled on information and belief and still satisfy *Iqbal/Twombly*, providing that the information which could support the claim is in the exclusive possession of the defendant. *Van Stelton*, 2013 WL 3776813, at *10. Indeed, a number of courts have declined to dismiss Title IX claims, including for selective enforcement, where the information necessary to support the claim was in the exclusive possession of the university. *See Trustees of the U. of Penn.*, 270 F. Supp. 799, 824 (E.D. Pa. 2017) (selective enforcement claim could proceed to discovery even though complaint alleged that comparator information in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female

16

students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

Contrary to Defendants' assertions, Plaintiff alleges more than "wholly conclusory allegations." *See* Moving Br. at 13. In support of his selective enforcement claim Plaintiff alleges that:

> as compared to female students accused of sexual misconduct, the number of male students found responsible for policy violations is far greater. As compared to females found responsible for similar violations of Northern Iowa's sexual misconduct policy, Northern Iowa has imposed far more severe and unduly harsh sanctions on male students.

Plaintiff was unable to get data to support this allegation from public sources. AC ¶ 123 & n. 24. Defendants have pointed to no public sources which disclose UNI's Title IX data, including the gender of respondents and associated outcomes. Moreover, Plaintiff's allegations are not conclusory, but grounded in the gender discrimination that he experienced with respect to the Title IX investigation and adjudication of Jane Roe's allegations. AC ¶¶ 86-101.

For these reasons, Defendants' motion to dismiss Plaintiff's Title IX selective enforcement claim should be denied.

## III.     Plaintiff Alleged A Plausible Procedural Due Process Claim

Defendants argue that Plaintiff's procedural due process claim (Count II) should be dismissed because: a) Plaintiff failed to exhaust his remedies prior to filing this lawsuit; b) the individual Defendants have qualified immunity; and c) a claim has not been alleged against Defendants Nook, Williams and Knudson in their official capacities. As fully set forth below,

17

except with respect to Knudson,[11] Defendants' arguments fail and the Court should deny that portion of Defendants' motion seeking to dismiss Plaintiff's due process claim.

### A. Plaintiff Was Not Required to Exhaust His Post-Deprivation Remedies

Defendants misstate the law on exhaustion of remedies when arguing for the dismissal of Plaintiff's procedural due process claim. It is well settled that "it is not necessary for a litigant to have exhausted available *postdeprivation* remedies when the litigant contends that he is entitled to *predeprivation* process." *Keating v. Nebraska Public Power Dist.*, 562 F.3d 923, 929 (8th Cir. 2009). *See also Raymond v. Bd. of Regents*, 847 F.3d 585, 590 (8th Cir. 2017); *Hopkins v. City of Bloomington*, 774 F.3d 490, 491 (8th Cir. 2014)[12] (noting that the appellant's pre-deprivation procedural due process claim failed as a matter of law such that post-deprivation process was sole issue); *C. Line, Inc. v. City of Davenport*, 957 F. Supp. 2d 1012, 1034-1035 (S.D. Iowa 2013). Here, Plaintiff alleges that UNI violated his right to procedural due process *predeprivation*, or before he was expelled.

As alleged in the Amended Complaint, "Northern Iowa deprived Kim of his property interest without affording him basic due process, including but not limited to, his right to a fair adjudication, his right to be heard by an impartial factfinder, to question his accuser, to challenge her credibility and the credibility of other adverse witnesses and to adequately present evidence and witnesses in his defense." AC ¶ 141. Plaintiff then outlines a number of due process violations that occurred *prior to* his expulsion. AC ¶ 142. *See id.* ¶¶ 58-85 (outlining violations that occurred prior to Plaintiff's expulsion becoming "final"). Given that Plaintiff's procedural due process claim

---

[11] Plaintiff agrees with Defendants that Paula Knudson should be dismissed from the action. *See* Moving Br. at 24.

[12] The remaining cases cited by Defendants are inapposite. In *Wax'n Works v. City of St. Paul*, 213 F.3d 1016, 1017 (8th Cir. 2000), the City had taken the plaintiff's real property pursuant to its power of eminent domain. The plaintiff challenged the post-deprivation procedures in place pursuant to state law. Likewise, in *Crooks v. Lynch*, 557 F.3d 846, 848-849 (8th Cir. 2009), the plaintiff asserted a due process claim concerning the appeal process in place for addressing the termination of his employment. The appeal was pending. In *Anderson v. Douglas County*, 4 F.3d 574, 577-578 (8th Cir. 1993), the plaintiff elected not to participate in a pre-deprivation hearing or file a post-deprivation appeal.

concerns the deficiencies that occurred prior to his expulsion, Defendants' exhaustion of remedies defense is meritless.

Assuming *arguendo* that Plaintiff were required to exhaust his administrative remedies with respect to the Title IX proceedings against him, he did precisely that. As alleged in the Amended Complaint, and supported by Defendants' "Attachment 3," UNI's Sexual Misconduct Policy expressly states that "Once an appeal is decided, the outcome is final: further appeals are not permitted under this policy." AC ¶¶ 47.k, 85; Defs. Attachment 3, ECF No. 31-2, at IV.C.6.

### B. The Due Process Claim Against the Individual Defendants Is Not Barred By the Doctrine of Qualified Immunity

In arguing that Plaintiff's procedural due process claim against the individual Defendants is barred by the doctrine of qualified immunity, Defendants do not dispute that Plaintiff has a protected property interest in his education.[13] Moving Br. at 17-21. Nor do Defendants address whether Plaintiff has plausibly alleged that Defendants deprived him of his constitutionally protected property interest by violating his right to due process in the Title IX disciplinary proceedings at issue in this action. Defendants solely argue that Plaintiff had no "clearly established right" with respect to the alleged due process violations. Moving Br. 19-21. On the contrary, Plaintiff had a clearly established right to the due process protections that he alleges were either omitted from the University's disciplinary process or which Defendants violated, including a fair hearing and the right of cross-examination.

---

[13] Plaintiff has alleged a property interest in his continuing education, including his "right to enrollment at Northern Iowa free from arbitrary and biased expulsion," arising from the "policies, course of conduct, practices and understanding established by Northern Iowa under color of state law" and "the express and implied contractual relationship he had with Northern Iowa." AC ¶¶ 130, 132, 133. *See Goss v. Lopez*, 419 U.S. 565 (1975); *Monroe v. Arkansas State U.*, 495 F.3d 591, 595 (8th Cir. 2007) (assuming without deciding that student's interest in pursuing his education at state university constituted a constitutionally protected interest); *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 253 (8th Cir. 1985) (property interest arose from contractual relationship between University and Student set forth in grievance procedures, giving plaintiff right to nonarbitrary grading).

19

At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In the Eighth Circuit, "procedural due process must be afforded on the college campus by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with *all necessary protective measures*." *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970) (emphasis added). Disciplinary proceedings require more stringent procedures because unlike academic proceedings that involve qualitative evaluations, disciplinary proceedings "bear a resemblance to traditional judicial and administrative factfinding." *Allahverdi v. Regents of University of New Mexico*, 2006 WL 131380 at *14 (D.N.M. Apr. 25, 2006). *See Goss v. Lopez*, 419 U.S. 565, 579-580 (1975); *Neal v. Colorado State U.*, 2017 WL 633045 at *24 (D. Co. Feb. 16, 2017) ("Due process for disciplinary proceedings is more extensive than for academic decisions"). In Spring 2017, Plaintiff had a clearly established right to heightened due process protections because he faced expulsion as an outcome in the University's Title IX disciplinary proceedings.[14]

### 1. Plaintiff Had A Clearly Established Right to An Impartial Process

It is axiomatic that due process "requires a fair and unbiased tribunal, regardless of whether that tribunal is in the context of a court hearing or some other administrative hearing." *C-Line, Inc.*, 957 F. Supp. 2d at 1040 (collecting cases). Although administrative adjudicators are "clothed with a 'presumption of honesty and integrity'…a plaintiff may overcome this presumption by making a 'substantial showing' that the adjudicator was biased or the hearing was otherwise unfair.'" *Id.* (quoting *United States ex rel. De Luca v. O'Rourke*, 213 F.2d 759, 765 (8th Cir. 1954)). The right to a fair and impartial process is well established by existing case law, including

---

[14] Plaintiff was also the subject of a police investigation at the time of the Title IX investigation. He was subsequently acquitted after a jury trial. AC ¶¶ 7-9.

during the time in which Plaintiff's case was investigated and adjudicated, in Spring/Summer 2017. *C-Line, Inc.*, 957 F. Supp. 2d at 1040. *See also Miami U.*, 882 F.3d at 604 (finding that right to impartial adjudicator was clearly established due process right in Fall 2014).

The right to an impartial tribunal was also clearly established by OCR Guidance in effect since 2011, more specifically, the April 4, 2011 Dear Colleague Letter (the "2011 DCL"). The 2011 DCL expressly required the impartial investigation and adjudication of sexual misconduct allegations, noting "a school's investigation and hearing processes cannot be equitable unless they are impartial." *Id.* at p. 12. The 2011 DCL further stated, "Public and state-supported schools must provide due process to the alleged perpetrator." *Id.* Given the well-established law of the Circuit, as well as the applicable OCR guidance, Defendants Gutknecht, Williams, Roybal, N. Rafanello and A. Rafanello reasonably should have known that their bias, and the unfairness in the procedures employed, violated Plaintiff's clearly established right to an impartial disciplinary process.

Here, Plaintiff's allegations, which must be taken as true at this stage of the action, are that: i) bias and conflict infected the Title IX process from start to finish; ii) N. Rafanello, who was involved with the criminal aspects of Plaintiff's case, presided over Plaintiff's hearing as the chair of the Conduct Board; iii) A. Rafanello, who was N. Rafanello's wife, served as an one of the Title IX investigators; iv) A. Rafanello also served as Assistant Dean of Students, creating a conflict; v) Gutknecht appointed A. Rafanello to serve as an investigator; vi) N. Rafanello was responsible for reviewing his wife's findings with respect to the allegations against Plaintiff; vii) Williams appointed N. Rafanello to chair the Conduct Board knowing that N. Rafanello's wife had conducted the investigation; and viii) Roybal, a Title IX Coordinator responsible for ensuring

UNI's compliance with Title IX, was responsible for deciding Plaintiff's appeal. AC ¶¶ 6, 15-20, 62, 70.

Plaintiff also alleged that the administrators involved in the Title IX process were trained in a manner which engendered bias against male respondents. AC ¶¶ 5, 118.a., 119.b., 157.b.

The investigation report, which was exclusively relied upon by the Conduct Board, also evidenced bias in the process because it showed that the investigators: i) never questioned Jane Roe's credibility, despite her conflicting statements—including telling a witness *that she may have consented to having sex with Plaintiff*—and her reported concern after they had sex was whether Plaintiff liked her (AC ¶¶ 4, 96.m, 96.r., 98-99); ii) assumed that Jane Roe was incapacitated and could not have consented to sex even though there was evidence cited in the report that demonstrated that Jane Roe was not incapacitated and that Plaintiff could not have reasonably known that she was (AC ¶¶ 87-91, 96-97); iii) declined to assess Kim's credibility based on his statement to police because they could not interview him in person due to pending criminal charges (AC ¶¶ 93); iv) discounted Plaintiff's written statement that Jane Roe initiated their sexual contact (AC ¶97); and v) included irrelevant and inflammatory statements in the report, including that Jane Roe had a torn hymen (AC ¶ 92).

Plaintiff further alleges an unfair process because: i) N. Rafanello, who later presided over the hearing, assumed that Plaintiff should be subject to criminal charges (AC ¶ 62); ii) Gutknecht, in violation of UNI's Title IX policy, allowed Jane Roe to select the policy violation(s) that Plaintiff should be charged with (AC ¶ 63); iii) UNI's legal counsel edited the investigation report (AC ¶ 69); iv) Plaintiff's "hearing" was limited in scope by Williams who informed Plaintiff that the sole purpose of the hearing was to review the investigative report (AC ¶ 70); v) Plaintiff was denied access to the evidence gathered by the Title IX investigators and could not adequately

22

prepare for the hearing (AC ¶ 78); vi) the conduct board members that participated in the hearing were not provided with the full record (*Id.*); vii) at the hearing, Plaintiff was not permitted to ask questions of Jane Roe, even through the conduct board (AC. ¶ 4); viii) the conduct board members adopted the biased investigation report (AC ¶ 4); ix) Plaintiff did not receive a deliberation report from the conduct board hearing until *after* he submitted his appeal of the board's decision (AC ¶ 82); x) the deliberation report provided no rationale for the decision to expel him (AC ¶ 81) and xi) Williams unilaterally granted Jane Roe an extension of time in which to appeal while denying Plaintiff's request for an extension (AC ¶¶ 72-77). *See also* AC ¶ 142.

These allegations support a procedural due process claim against the individual Defendants on the ground that they violated Plaintiff's clearly established right to fair and impartial process.

### 2. **Plaintiff Had A Clearly Established Right to Review the Evidence Against Him**

As set forth by the United States Supreme Court in *Goss v. Lopez*, 419 U.S. at 581, in disciplinary cases in which a student denies the charges against him, due process requires "an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id. See Miami U.*, 882 F.3d at 603 (failing to provide disciplinary file relied upon in drafting report was equivalent of failure to explain evidence); *Norris*, 2019 WL 764568, at *14 (delay in providing access to evidence against plaintiff plausibly alleged due process violation). This level of due process is required in cases in which a student faces the far less serious consequence of a short-term suspension and, accordingly, greater protections are warranted in a case such as Plaintiff's where expulsion is a potential sanction. *Id.* at 584.

Here, Plaintiff alleges that he was denied a proper explanation of the evidence as Gutknecht denied him access to the evidence relied upon in writing the investigation report, including witness

23

statements, prior to the hearing. AC ¶¶ 4, 78, 142.e. This prevented Plaintiff from meaningfully participating in the hearing. AC ¶ 142.e.

Defendant Gutknecht reasonably should have known that she was violating Plaintiff's due process right to an explanation of the evidence against him, as well as a meaningful opportunity to be heard, when denying him access to the underlying evidence in Plaintiff's case.

### 3. Plaintiff Had A Clearly Established Right of Cross-Examination

As of Spring/Summer 2017, Plaintiff has a clearly established right to conduct a cross-examination at his hearing. *See Dillon v. Pulaski Cty. Special Sch. District*, 594 F.2d 699, 700 (8th Cir. 1979). *See also Flaim v. Medical College of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (where case involves choice between accuser and accused cross-examination is essential to due process); *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972); *Doe v. Ohio State U.*, 219 F. Supp. 3d 645, 663 (S.D. Ohio 2016) (same); *Doe v. Brandeis U.*, 177 F. Supp. 3d 561, 604 (D. Mass. 2016) ("the ability to cross-examine is most critical when the issue is the credibility of the accuser"); *Furey v. Temple U.*, 884 F. Supp. 2d 223, 251-252 (E.D. Pa. 2012) ("due process required that the plaintiff be able to cross-examine witnesses"). More recent cases have also held that, in cases where credibility is at stake, due process requires that cross-examination be allowed in student disciplinary cases. *See Baum*, 903 F.3d at 581-582; *Doe v. U. of Cincinatti*, 872 F.3d 393, 401 (6th Cir. 2017); *Norris*, 2019 WL 764568, at *15.

Plaintiff has alleged that this clearly established due process right was violated by Williams who narrowed the scope of the hearing to only include discussion of the investigation report and specifically advised Kim that he was only allowed to ask clarifying questions about the report. AC ¶¶ 70, 118.f.

24

Williams reasonably should have known that she was violating Plaintiff's clearly established right of cross-examination when she precluded Plaintiff from cross-examining Jane Roe at the hearing in a clear case where the Conduct Board had to choose between the account given by the accuser versus the accused.

For the above-stated reasons, the Court should deny Defendants' motion to dismiss Plaintiff's due process claim, for damages, against Gutknecht, Roybal, Williams, N. Rafanello and A. Rafanello as individual Defendants.[15]

### C. **Plaintiff's Official Capacity Claims Should Not Be Dismissed**

Plaintiff does not seek money damages with respect to his procedural due process claim against Defendants Nook, Gutknecht. Roybal, Williams, N. Rafanello and A. Rafanello *in their official capacities*. Rather, he seeks injunctive relief against these Defendants. AC ¶ 148. Defendants concede that "the Eleventh Amendment does not bar official-capacity claims for injunctive relief against state officials." Moving Br. at 21, n. 8. Defendants further concede that to the extent Plaintiff seeks injunctive relief against Defendants Gutknecht, Roybal, N. Rafanello and A. Rafanello in their official capacities that these claims *should not* be dismissed. Moving Br. at 21 n. 8, 22-24 (seeking dismissal of due process claim only as to Nook, Williams and Knudson).

With respect to Nook, Plaintiff has alleged a due process claim against the President in his official capacity. More specifically, Plaintiff has alleged, upon information and belief, that "Nook is the University official charged with [disclosing] student education records, including Plaintiff's, to third-party requestors." AC ¶ 14. Defendants do not address this allegation. In this role, Nook would be the University official responsible for carrying out any court-ordered injunctive relief

---

[15] As set forth *infra* Plaintiff is only seeking injunctive relief against Nook.

Case 6:19-cv-02037-CJW-KEM   Document 46   Filed 11/06/19   Page 25 of 29

and, accordingly, should not be dismissed from the action. *See, e.g.*, *Doe v. DiStefano*, 2018 WL 2096347, at **3-4 (D. Colo. May 7, 2018).

Plaintiff has also alleged an official capacity claim against Williams because, contrary to Defendants' assertions, Plaintiff alleged that Williams knowingly appointed N. Rafanello, who had a clear conflict of interest to serve as Chair of the Conduct Board assigned to Plaintiff's hearing. AC ¶¶ 70, n. 16, 142.c. As discussed *supra* Plaintiff also alleged that Williams violated his right to a fair hearing and opportunity to be heard by narrowing the scope of Plaintiff's hearing to exclude cross-examination. AC ¶ 70. Williams also unilaterally provided Jane Roe with an extension of time to respond to Plaintiff's appeal, alerting Gutknecht who subsequently denied Plaintiff's request for an extension of time to submit his appeal. AC ¶¶ 72-73.

For the above-stated reasons, the Court should deny Defendants' motion to dismiss Plaintiff's due process claim, for injunctive relief, against Nook, Gutknecht, Roybal, Williams, N. Rafanello and A. Rafanello in their official capacities.

## IV.    Plaintiff Plausibly Alleged A Breach of Contract Claim

The Court should deny that portion of Defendants' motion seeking to dismiss Plaintiff's breach of contract claim. Defendants argue, without basis, that Plaintiff failed to allege the existence of a contract in support of his breach of contract claim (Count III). Moving Br. at 25. It is well settled that "[t]he relationship between a university and student is contractual in nature" and that the policies and procedures set forth in a student handbook, or other statement of policy, constitute an enforceable contract. *Corso v. Creighton U.*, 731 F.2d 529 (8th Cir. 1984) (applying federal case law). *See Ikpeazu v. U. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985) (relying on *Corso*); *Rossley v. Drake U.*, 342 F. Supp. 3d 904, 944-945 (S.D. Iowa 2018) (denying summary

judgment on breach of contract claim which alleged that University breached sexual misconduct policy by failing to conduct equitable investigation and apply correct burden of proof).

Despite Defendants' arguments to the contrary, *Warren v. Drake University*, 886 F. 2d 200 (8th Cir. 1989), supports Plaintiff's breach of contract claim and goes against dismissal because, as Defendants point out, "the issue of what documents constitute a contract is…properly one for the *jury* to decide." *Warren*, 886 F.2d at 201 (emphasis added). *See* Moving Br. at 25-26. Accordingly, Defendants' argument that the Court should determine, as a matter of law, that there is no contract is not only meritless but nonsensical. Moving Br. at 26. Notably, in *Warren*, the jury found that that honor code and the student handbook were part of the plaintiff's contract with the university.

*Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443 (Iowa Ct. App. 1984) is also distinguishable because it was not a breach of contract action. Rather, the court addressed the requirements imposed on private universities vis-à-vis their students under the common law. The court held that private universities have common law obligations which parallel due process under the Fourteenth Amendment, and, for this reason, analyzing the relationship of a private university under either the law of contracts or the law of associations is not a perfect fit. The court agreed "with those courts which hold that a student at a private school should be able to rely upon the school to follow the established procedures it voluntarily promulgated" and found that the issue of whether the university substantially complied with its written regulations should have been submitted to the jury. *Id.* at 446. *Slaughter v. Brigham Young University*, 514 F.2d 622 (10th Cir. 1975), also analyzed a contract claim against a private university invoking similar principles to the *Harvey* court.

*Tibbetts v. Yale Corporation*, 47 Fed. App'x 648 (4th Cir. 2002), concerned *one chapter* of a university's student handbook which the Court found did not constitute a contract because it merely expressed the university's "overriding commitment to free expression." *Id.* The Court did not find that there were *no* contractual obligations with respect to the plaintiff but, as alleged by the plaintiff, the university *breached no* contractual obligations with the plaintiff.

Plaintiff's allegations that UNI's Student Conduct Code and Sexual Misconduct Policy created a contract between Plaintiff and UNI sufficiently allege the existence of a contract at this stage of the action. Should Plaintiff's breach of contract claim proceed to trial, then a jury may decide which documents comprise the contract. Defendants do not take issue with the numerous, specific breaches of express agreements that Plaintiff alleged in the Amended Complaint. *See* AC ¶ 157.[16]

Defendants also argue that Plaintiff failed to "allege what his performance obligations were under the terms of the contract" or that he performed the terms and conditions required of him under the contract. Moving Br. at 26-27. On the contrary, Plaintiff alleged that: (i) he paid his tuition (AC ¶ 151); (ii) at the time of Jane Roe's allegations he was a student in good standing at UNI (AC ¶ 38); and (iii) Plaintiff was innocent of the charge that he violated UNI's Sexual Misconduct Policy (AC ¶¶ 55-57, 80, 91, 93, 96).

For the above-stated reasons, the Court should deny Defendants' motion to dismiss Plaintiff's breach of contract claim.

---

[16] Plaintiff agrees with Defendants that UNI has immunity to the extent that Plaintiff seeks recovery for breaches of an implied contract. Accordingly, Plaintiff's breach of contract claim is to be construed as seeking recovery for UNI's breaches of an express contract between UNI and Plaintiff, comprised of UNI's Student Conduct Code and Sexual Misconduct Policy. AC ¶¶ 156, 157, 158. Notably, Defendants have not asserted immunity with respect to breaches of the covenant of good faith and fair dealing implied in all contracts. AC ¶ 155.

**CONCLUSION**

For all the reasons set forth above, this Court should deny Defendants' motion to dismiss Plaintiff's First Amended Complaint in its entirety, along with such other and further relief as the Court deems just and proper.

Dated: November 5, 2019

Respectfully Submitted,

_____/s/_____
Thomas P. Frerichs AT0002705
P.O. Box 328
106 East 4th Street
Waterloo, Iowa 50704-0328
Phone: (319) 236-7204
FAX: (319) 236-7206
tfrerichs@frerichslaw.com

NESENOFF & MILTENBERG, LLP

/s/Andrew T. Miltenberg____
Andrew T. Miltenberg, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York, 10001
(212) 736-4500
amiltenberg@nmllplaw.com

ATTORNEYS FOR PLAINTIFF

29